UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ILICH ERNESTO VARGAS ROMERO,<br><br>        Petitioner,<br><br>        v.<br><br>JOHN McMAHON, San Bernardino County Sheriff,<br><br>        Respondent. | Case No.  EDCV-16-1931-R (KES)<br><br>FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE |

      This Report and Recommendation is submitted to the Honorable Manuel L. Real, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.

## INTRODUCTION

Petitioner is presently in state custody awaiting trial in San Bernardino County Superior Court ("SBCSC") case no. FVI-1203282 on multiple felony charges, including murder and driving under the influence. (Dkt. 1 at 1, 21[1]; Case 5:16-cv-00231-R-KES, Dkt. 11 at 3 ["IFP Order" denying IFP status in Petitioner's earlier § 1983 lawsuit].) Petitioner was arrested in December 2012 after driving the wrong way on the freeway, crashing into an oncoming car, and killing his passenger, Kellie Hughes. (Dkt. 1 at 21; IFP Order at 3.) Blood tests were positive for methamphetamine and marijuana. (IFP Order at 3 n.4.) Petitioner had two prior DUI convictions before the crash that killed Ms. Hughes. (Id.)

Petitioner has not yet been tried because of multiple changes in representation. Initially, he was represented by retained attorney David Chesley, but he fired and sued Mr. Chesley. (IFP Order at 4-5, citing CV 15-0293-R (MAN) [Petitioner's first § 1983 lawsuit against Chesley and the State Bar].) From March 2013 until March 2014, he was represented by San Bernardino County deputy public defender, Joshua Castro. (Id. at 4-5.) Upon firing and suing Mr. Castro, he represented himself. (Id. at 6.) In March 2016, he retained attorney James Terrell to represent him.[2]

On September 9, 2016, Petitioner filed the instant Petition for Writ of Habeas Corpus by a Pre-Trial Detainee in State Custody pursuant to 28 U.S.C. § 2241 (the "Petition"). (Dkt. 1.) He asserts the following six grounds for relief:

---

[1] All page citations are to the CM/ECF pagination.

[2] The Court may take judicial notice of the SBCSC's online records. See Fed. R. Evid. 201(b); Porter v. Ollison, 620 F.3d 952, 954-55 (9th Cir. 2010). Per the most recent entry in Petitioner's case, on January 27, 2017, Attorney Terrell appeared for Petitioner. Petitioner has agreed to waive time until March 28, 2017. The next court date is March 3, 2017.

2

   (1)   He has been denied various constitutional rights by "outrageous government conduct." (Id. at 7, 13.)

   (2)   The police destroyed exculpatory evidence in bad faith. (Id. at 8, 13.)

   (3)   His preliminary hearing was unfair for a variety of reasons, including the prosecutor's failure to disclose impeachment evidence. (Id. at 8.)

   (4)   He received ineffective assistance of counsel from Mr. Chesley at his preliminary hearing. (Id. at 9, 14.)

   (5)   He was denied a meaningful opportunity to represent himself by SBCSC rulings denying his motions for extra pro per privileges. (Id.)

   (6)   The delay in his arraignment interfered with the preparation of his defense. (Id.) Petitioner points to a "5 to 6 hour in-custody interrogation" at the hospital following his arrest as violating his right to a prompt arraignment. (Id. at 39-40.)

Petitioner contends that he has already presented all of these claims unsuccessfully to the criminal trial court and higher California courts through multiple habeas petitions. (Id. at 16-17.) Petitioner now seeks an order from this Court (1) releasing him from state custody, (2) dismissing the state criminal case against him with prejudice, and (3) staying the prosecution of the criminal case until this Court grants his Petition. (Id. at 9.)

On October 19, 2016, Respondent moved to dismiss the Petition without prejudice relying on the abstention doctrine in Younger v. Harris, 401 U.S. 37 (1971). (Dkt. 12.) Petitioner filed an Opposition (Dkt. 19) and Respondent filed a Reply (Dkt. 24).

For the reasons discussed below, Younger abstention disfavors federal intervention in Petitioner's ongoing criminal prosecution, and the Petition should be

3

1  dismissed without prejudice.

## II.

## FACTUAL BACKGROUND[3]

Petitioner alleges that while hospitalized after the fatal crash, he was interrogated by the police without Miranda warnings and "manipulated" by false promises to answer their questions. (Dkt. 1 at 23; Dkt. 1-4 at 83 to Dkt. 1-5 at 64 [transcript of interview].) Petitioner told the officers that he was driving on the wrong side of freeway to escape a "group of people" from Guatemala who wanted to harm him because his estranged wife had "assisted to uncover" a life insurance fraud scheme. (Dkt. 1 at 23-24.)

Prior to the crash, he met with his wife to discuss her claimed pregnancy, but he somehow discovered that she had been accessing "secret internet accounts and rogue web pages with her cell-phone," so Petitioner left the meeting, but took his wife's cell phone with him to "inspect" it. (Id. at 24-25.) Once he had the phone, he was tracked by a group of 20 to 30 people. (Id. at 25.) They followed him to a truck stop, but he hid in a shower. (Id.) When he left the truck stop, they followed him to at least three other locations (a Sport Chalet and two gas stations). (Id.) Petitioner gave the investigating officers the cross streets and told them to get surveillance footage from these businesses to prove he was there. (Id.) He also told the officers that he left voice messages for his parole officer and others that would show he feared for his life, and that evidence on his wife's cell phone would show how she was plotting against him.[4] (Id. at 26.)

After he arrived home, Ms. Hughes came over. (Id. at 28.) She "used to be"

---

[3] The Court summarizes the Petition's factual allegations at some length because they inform the parties' arguments concerning Younger abstention.

[4] Petitioner obtained Sprint cell phone records showing that on December 7 and 8, 2012, his mother's phone (909-753-**97) tried to call his parole agent six times and 911 three times. (Id. at 71-73; Dkt. 1-10 at 38, 41.)

1  Petitioner's girlfriend, and they began "dating again" when Petitioner's wife left
2  him. (Dkt. 1-7 at 100.) She sold him drugs. (Id.) She also informed him that his
3  wife was involved with a motorcycle gang and his life was in danger. (Dkt. 1 at
4  28.) Petitioner made several 911 calls reporting armed motorcycle riders "circling
5  and roaming around" his property, but his 911 calls were interfered with by "some
6  type of electronic technology" and people "hacking" into his phone. (Id. at 29-30.)
7  He then drove himself and Ms. Hughes to the Phelan Sheriff's Substation seeking
8  protection. (Id. at 29.) Again, he was followed by the same people he had seen the
9  day before; this time, they tried to run him off the road. (Id.)

10  When he arrived at the substation, no one was there. (Id. at 30.) He next
11  drove to a Stater Brothers market where he tried to convince Ms. Hughes to go into
12  the store for her own safety. (Id.) He told the police that there should be
13  corroborating surveillance video from the substation and the market. (Id. at 31.)
14  Eventually, he pulled onto the freeway the wrong direction, still trying to flee from
15  his pursuers. (Id. at 34.) He drove on the emergency shoulder and only crossed
16  into oncoming traffic when Ms. Hughes "pulled on the steering wheel while
17  attempting to throw her purse out the window" because it contained drugs.[5] (Id.)
18  Petitioner told the police that the contents of Ms. Hughes' purse might show that
19  she was part of the conspiracy and was trying to "set up" Petitioner because of
20  threats that "she and her son would be murdered." (Id.) Petitioner also gave his
21  wife's cell phone to the police and asked that they investigate it for hacking. (Id. at
22  36-37.)

23  Petitioner complains that neither the police nor his own attorneys ever
24  collected any of the evidence that he identified during his hospital interview. (Id. at
25
26  ---
    [5] The police did find drugs in Ms. Hughes pocket and a meth pipe with drugs
27  in Petitioner's sock. (Dkt. 1-4 at 68.) The list of evidence collected at the scene
    does not include Ms. Hughes' purse. (Id.)
28

5

35.) Their delays meant that the surveillance camera footage from the relevant dates and locations was lost. Ms. Hughes' purse was recovered at the scene, held by the coroner's office, then later released to her family rather than held as evidence. (Id. at 88.)

Next, Petitioner complains that the SBCSC should have granted his Faretta motion and allowed him to represent himself at the preliminary hearing. (Id. at 57.) He alleges that the Magistrate Judge who denied the motion failed to disclose a conflict of interest, i.e., that she was married to "a head supervisor" at the San Bernardino County Public Defender's Office. (Id. at 59.) Mr. Castro represented Petitioner at the February 18, 2014, preliminary hearing. Petitioner contends that Mr. Castro failed to attack the police as biased, present witnesses including Petitioner's mother, present a psychiatric expert to testify about his "mental trauma," argue necessity and duress as a defense, and discredit a jailhouse informant, Randy Turpin.[6] (Id. at 62-64, 69, 72.) Petitioner contends that the prosecutor failed to disclose text messages from Ms. Hughes' phone that would have discredited Mr. Turpin. (Id. at 77, 85.) For this reason, counsel was unable to effectively cross-examine the officer who relayed Mr. Turpin's statements. Petitioner also argues that Mr. Castro should have insisted on re-testing his blood samples, because an expert toxicologist might have provided evidence that "the amount of drug traces found in [Petitioner's] blood samples was insufficient and inconclusive to support any actual impairment …." (Id. at 69.)

After the preliminary hearing, Petitioner was arraigned on February 25, 2014. (Id. at 89.) Petitioner complains that although multiple Marsden hearings were held, he was denied substitution of counsel on a "capricious,

---

[6] According to the prosecutor, Mr. Turpin was housed adjacent to Petitioner in jail. He told police that Petitioner had confessed to driving intentionally the wrong way on the freeway to kill his girlfriend because she wanted to break up with him. (Dkt. 1-7 at 90; Dkt. 1-10 at 28-31.)

6

whimsical and arbitrary basis," forcing him to request to represent himself. (Id. at 91-93.) Eventually, his Faretta motion was granted.

Once he became an in-custody pro per, he was denied services needed to prepare his defense, such as sufficient telephone usage, photocopier usage, writing supplies, and legal research materials. (Id. at 95-96.) He made many related motions to the SBCSC court, including motions for a legal runner, transcripts of earlier Marsden hearings, advisory counsel, and additional phone privileges. (Id. at 100.) Petitioner complains that Judge Tomberlin was biased against him, declaring some of Petitioner's requests were "nonsense" and "a waste of everyone's time." (Dkt. 1-1 at 3.) Petitioner was granted a private investigator and additional legal supplies, including extra phone time, but he alleges the extra supplies were insufficient and the investigator was incompetent. (Id. at 4-6.) He further alleges that Judge Tomberlin was determined not to "do anything that would assist" Petitioner to "punish" him for representing himself. (Id. at 8.) He contends he was not denied privileges because of his own violations of prison disciplinary policies, but because of judicial bias.[7] (Id. at 17.) His motion to disqualify the trial judge was wrongly denied. (Id. at 19.) Nevertheless, in October 2015, his case was transferred from Judge Tomberlin to Judge Rogan. (Id. at 20.)

In addition to judicial misconduct, Plaintiff alleges misconduct by the prosecutor and court staff. The police obtained a search warrant for Petitioner's jail cell because the prison law library staff intercepted un-redacted discovery mailed to Petitioner and feared earlier discovery might also have been unredacted.[8] (Id. at 36, 40, 42.) According to Petitioner, executing the warrant allowed the prosecutor to see and destroy documents revealing his defense strategy. Petitioner also

---

[7] Petitioner's prior § 1983 action discusses prison disciplinary actions against him. See IFP Order at 27-30.

[8] Police reports addressing this are at Dkt. 1-7, pp. 61-68.

7

complains that the SBCSC staff enforced unreasonable policies for obtaining subpoenas and local rules limiting the hours of court-appointed investigators.  (Id. at 56, 89.)

Eventually, Petitioner filed a 200-page motion to dismiss all the charges against him under Penal Code § 995.[9]  Judge Rogan denied his motion to continue the hearing and then denied the motion.  (Id. at 59-61.)  At one point during the hearing, she ordered Petitioner to "stop talking."  (Id. at 66.)  She also said that the prosecutor's suppression of Ms. Hughes's text messages was of "no consequence," thereby failing to "exercise sound reasoning."[10]  (Id. at 87.)  Petitioner subsequently

---

[9] Penal Code § 995(a)(1) permits an indictment to be set aside if the defendant was indicted without probable cause.  Section (a)(2) permits an information to be set aside if the defendant (A) was not "legally committed" before the information was filed or (B) was committed without probable cause.  Petitioner argued under (a)(2)(A) that he was not "legally committed" because of violations of his constitutional rights during the preliminary hearing process, including (1) the prosecutor's failure to disclose text message evidence that would have impeached the jailhouse informant, (2) the police's failure to find and preserve potentially exculpatory evidence, and (3) denial of his Marsden motions.  (Dkt. 1-1 at 70-84.)  He argues the judge wrongly considered his motion under (a)(2)(B).  (See Dkt. 1-8 at 6.)

[10] Per the hearing transcript, Petitioner presented a lengthy argument.  (Dkt. 1-7 at 88 to Dkt. 1-8 at 4.)  The court denied the § 995 motion, finding Petitioner had shown neither ineffective assistance of counsel nor a denial of his Faretta rights at his preliminary hearing.  (Dkt. 1-8 at 4-6.)  The court also explained why, even without Mr. Turpin's statements, there was sufficient evidence to establish probable cause on the murder charge.  (Dkt. 1-7 at 90; Dkt. 1-8 at 6-7.)  Petitioner then requested more time to argue the constitutional bases of his motion.  (Dkt. 1-8 at 7.)  He repeated that text message evidence from Ms. Hughes's phone would have impeached Mr. Turpin, but it was "suppressed" by the prosecution and not available at the preliminary hearing.  (Id. at 8.)  The judge responded, "Mr. Vargas, I'm not going to talk about what was suppressed.  That is of no consequence to me that it was suppressed."  (Id.)  Petitioner argues that this shows the judge denied his motion based on "extrajudicial considerations" because the civil rights violations alleged by Petitioner "were simply of no personal consequence to [her]."  (Dkt. 19 at 14.)  Petitioner misconstrues the judge's statement.  The judge had already

8

moved to disqualify Judge Rogan, and she struck the motion as procedurally improper. (Id. at 67.) Petitioner then filed a writ challenging that decision which was summarily denied. (Id.) Petitioner also filed unsuccessful writs at the California Court of Appeal and Supreme Court concerning the denial of his § 995 motion. (Id. at 68.)

When Judge Rogan refused to continue the trial date again and refused to grant him yet additional pro per privileges, Petitioner decided to find private representation. (Id. at 94.) He retained Mr. Terrell "under duress" in March 2016. (Id. at 99; Dkt. 1 at 97-98.) It is unclear when Petitioner's criminal case will go to trial.

## III.

## DISCUSSION

### A. The Younger Abstention Doctrine.

In the seminal case of Younger v. Harris, 401 U.S. 37 (1971), after Defendant Harris was indicted for violations of California's Criminal Syndicalism Act, he sued in federal court to enjoin his prosecution, contending that the Act was an unconstitutional restraint on free speech. The United States Supreme Court determined that Defendant Harris's situation did not present the "factors necessary under equitable principles to justify federal intervention …." Id. at 54. Specifically, he had failed to show that his prosecution would result in "irreparable injury" that was "both great and immediate." Id. at 46. The Court noted that injury in the form of "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution" was not an irreparable injury for purposes of obtaining

---

explained that even if Mr. Turpin had been discredited at the preliminary hearing, there would still have been enough evidence to hold Petitioner on the murder charge. (Dkt. 1-7 at 90.) Thus, Judge Rogan meant that the DA's failure to disclose the messages prior to the preliminary hearing was of "no consequence" to her reasoning in denying the § 995 motion.

9

equitable relief in federal court. Id.

Younger abstention is rooted in "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 431 (1982). Younger abstention promotes comity, an idea that encompasses "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." Id., citing Younger, 401 U.S. at 44. "Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." Id.

The application of Younger abstention requires an (1) ongoing state judicial proceeding that (2) implicates important state interests and (3) provides an adequate opportunity to raise federal claims, which (4) the federal court action would enjoin. AmerisourceBergen Corp. v. Roden, 495 F.3d 1143, 1148-49 (9th Cir. 2007). Even when these four factors are present, federal courts may decline to apply Younger in the event of (1) extraordinary circumstances where the danger of irreparable injury is great and immediate, or (2) judicial bias rendering the state proceedings unconstitutional.

As an example of the "extraordinary circumstances" exception, the Younger Court cited the facts of Dombrowski v. Pfister, 380 U.S. 479 (1965). Younger, 401 U.S. at 47. In Dombrowski, the defendants were prosecuted for alleged violations of various anti-Communist Louisiana statutes. The defendants' offices were "raided and all their files and records seized pursuant to search and arrest warrants that were later summarily vacated by a state judge for lack of probable cause." Younger, 401 U.S. at 48. Despite "the state court order quashing the warrants and suppressing the evidence seized, the prosecutor was continuing to threaten to

10

initiate new prosecutions … under the same statutes" and "was holding public hearings at which photostatic copies of the illegally seized documents were being used …." Id. The Dombrowski Court concluded that these factual allegations depicted "a situation in which defense of the State's criminal prosecution will not assure adequate vindication of constitutional rights. They suggest that a substantial loss … of freedoms of expression will occur if appellants must await the state court's disposition and ultimate review in this Court of any adverse determination." 380 U.S. at 485-486.

As an example of the "judicial bias" exception, in Gibson v. Berryhill, 411 U.S. 564 (1973), several optometrists filed suit under 42 U. S. C. § 1983 and asked the district court to enjoin state license revocation proceedings, arguing that the members of the adjudicatory body, i.e., the Alabama Board of Optometry, had a pecuniary interest in the outcome. The United States Supreme Court agreed that the district court could issue the requested injunction rather than dismissing the case under Younger, because due process demands that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." Id. at 579.

In contrast, in Kugler v. Helfant, 421 U.S. 117 (1975), a state judge was indicted for obstruction of justice and false testimony. He filed suit under 42 U.S.C. § 1983, alleging that the members of the New Jersey Supreme Court had coerced him into waiving his Fifth Amendment privilege and testifying before a grand jury. He argued that the members of the state judiciary had become so personally involved in his case that he would be unable to receive a fair hearing in the state court system. Assuming the allegation to be true, the United States Supreme Court held that any judicial coercion did not "so irretrievably impair[]" the objectivity of the state court system to deprive petitioner of the opportunity to raise his federal claims. Id. at 127. The Court held that, while it acknowledged the administrative authority the New Jersey Supreme Court exercised over the trial judges who would

11

decide defendant's claims, it could not be assumed that "no trial judge in New Jersey will be capable of impartially deciding his case." Id.

**B.     Discussion.**

    **1.     This Case Satisfies All Four Younger Factors.**

Respondent argues that Petitioner is seeking to enjoin an ongoing state criminal prosecution that will provide him with an adequate opportunity to raise his federal claims.

Petitioner appears to contend that his state prosecution is not "ongoing." State proceedings are considered ongoing for purposes of Younger if the defendant's appellate remedies have not been exhausted. Huffman v. Pursue, Ltd., 420 U.S. 592, 609 (1975). Petitioner argues that he has exhausted his appellate remedies, because he has raised his claims to the California Supreme Court in various petitions for writ of habeas corpus. (Dkt. 19 at 7, 21.)

This Court finds that Petitioner's state prosecution is "ongoing" for purposes of applying Younger. Petitioner has not yet had an opportunity to file pre-trial, evidentiary motions or to object to evidence at trial, because he has not yet been tried. He has not had an opportunity to present any claims to the California courts on direct appeal. In the California court system, "habeas corpus cannot serve as a substitute for an appeal …." In re Harris, 5 Cal. 4th 813, 829 (1993), citing In re Dixon, 41 Cal. 2d 756, 759 (1953). In February 2015, the SBCSC denied his petition for writ of habeas corpus precisely because his claims needed to be raised first via direct appeal. (Dkt. 1-4 at 56.) Thus, the California courts have not necessarily considered and rejected the merits of Petitioner's constitutional claims.

Petitioner also appears to argue that he will not have an adequate opportunity to present his constitutional claims in state court, because the California courts have demonstrating an "unwillingness" to protect him from constitutional harm by consistently ruling against him. (Dkt. 19 at 5, 15.) The "adequate opportunity" Younger factor considers whether a procedural mechanism exists to raise

constitutional claims; it does not consider the likelihood that those claims will be decided for or against the defendant. See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc., 477 U.S. 619, 629 (1986) (even if complainants could not raise their First Amendment objections in the administrative hearing, it sufficed that objections could be aired in state court judicial review of any administrative decision). Again, as a matter of comity, this Court presumes that the California courts will safeguard Petitioner's federal constitutional rights unless there is sufficient evidence to rebut that presumption. Nothing in the instant Petition is sufficient to rebut that presumption.

### 2. This Case Does Not Meet Either Younger Exception.

#### a. Judicial Bias.

Petitioner argues that virtually all of the SBCSC judges involved in his criminal prosecution are biased against him. (Dkt. 19 at 12.) They have demonstrated this bias by denying what he contends were meritorious motions. He alleges that their rulings exhibited hostility towards his pro se status and served "no legitimate justifiable state interest." (Id. at 6.)

The Petition has not demonstrated that judicial bias will prevent Petitioner from presenting his constitutional claims in state court. None of Petitioner's factual allegations, even if accepted as true, tend to show judicial bias. The fact that a judge tells a litigant to "stop talking" or that he is presenting matters "of no consequence" is not evidence of bias; it is evidence that the judge is appropriately managing time in the courtroom. The fact that a judge warns an incarcerated defendant who is considering self-representation that he will encounter difficulties if he fires his public defender is not evidence of bias. To the contrary, the law requires trial courts to provide "some instruction or description, however minimal, of the specific dangers and disadvantages of proceeding pro se." United States v. Hayes, 231 F.3d 1132, 1137-1138 (9th Cir. 2000). The fact that a judge exercises discretion in deciding how many tax payer-funded pencils, envelopes, telephone

cards, investigator hours, and other supplies must be given to an indigent, pro se litigant to secure his meaningful access to the courts, and ultimately decides to give the litigant less than what he requested, is not evidence of bias.  Indeed, Petitioner has clearly been given enough supplies to file lengthy pleadings in this case and others.

Second, Petitioner's allegations of bias are rendered less-than credible because they are aimed at so many different people.  As Judge Rogan explained, five different judges reviewed Mr. Castro's performance and denied Petitioner's Marsden motions.  (Dkt. 1-8 at 4-5.)  Petitioner then tried to sue four of those five judges.  (IFP Order at 7.)  He also claimed that his own lawyers, the prosecutors, the SBCSC staff, the police, and the correctional officers were all biased against him.  Earlier, he tried to sue the California State Bar.  (See case 5:15-cv-00293-R-MAN.)  He is currently a class representative in case 5:14-cv-02171-JGB-SP claiming that the San Bernardino Sheriffs have denied him equal treatment because he self-identifies as gay, bisexual, or transgender.  (Dkt. 37 [second amended complaint].)

Third, Judge Rogan specifically indicated, "All of the issues that you brought to the Court's attention today are very well-pointed issues to be brought to a jury trial."  (Dkt. 1-8 at 6.)  She further indicated that Petitioner can cross-examine the police at trial concerning why they declined to collect the surveillance videos he requested.  (Id. at 8.)  Thus, the state trial court has indicated its willingness to hear and consider Petitioner's constitutional claims at the proper time.

    b. Extraordinary Circumstances.

Unlike the defendant in Younger, Petitioner is not being criminally prosecuted for conduct that arguably enjoys constitutional protection.  Nevertheless, Petitioner argues that his case presents "extraordinary circumstances" creating a greater risk of irreparable injury than existed in Younger because (1) his prosecution is the result of bad faith, and (2) the state authorities have

14

systematically prevented him from preparing a defense. (Dkt. 19 at 2, 4, 18-19.)

As to the first argument, none of Petitioner's allegations tend to show that his prosecution is the result of bad faith. Only prosecutions undertaken "without hope of obtaining a valid conviction" support federal injunctive relief against pending state prosecutions. Perez v. Ledesma, 401 U.S. 82, 85 (1971), Juidice v. Vail, 430 U.S. 327, 338 (1977). Petitioner admits that he was driving the wrong way on the freeway when a fatal crash occurred, and he was found to have drugs in his sock and his bloodstream. These facts alone are sufficient to initiate a criminal proceeding against Petitioner in good faith. Petitioner can certainly present evidence at trial in support of his defense that he was acting out of fear and desperation rather than malice, but the state authorities are not displaying "bad faith" by requiring Petitioner to prove that defense at trial.

As to the second argument, none of the state courts' orders have prevented Petitioner from accessing the courts, because he continuously made numerous and voluminous filings. The amount of court time and resources allocated to pro se inmates is a garden-variety case management issue. Disagreements over case management issues do not present a likelihood of great and immediate irreparable injury justifying federal intervention. If that were not so, then self-represented inmates could endlessly file petitions asking district courts to stay or enjoin their criminal cases in order to review the state judges' decisions allowing them "X" pencils rather than "Y," thereby delaying their trials and perhaps weakening the evidence against them. Avoiding this kind of federal intervention is precisely why Younger abstention exists.

//
//
//
//
//

//
//
//
//

# VII.
# RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Judge issue an Order: (1) accepting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition and dismissing this action without prejudice.

DATED:  February 13, 2017

_____
KAREN E. SCOTT
United States Magistrate Judge

# NOTICE

Reports and Recommendations are not appealable to the Court of Appeals, but are subject to the right of any party to timely file Objections as provided in the Federal Rules of Civil Procedure and this Report. This Report and any Objections will be reviewed by the District Judge whose initials appear in the case docket number.